IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11 mj 558 |
| | ) | |
| SYED GHULAM NABI FAI | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZAHEER AHMAD | ) | |

## AFFIDAVIT

I, Sarah Webb Linden, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States
Department of Justice. I have been employed by the FBI for approximately thirteen years, during
which time I have been assigned to the Counterterrorism Division, the San Francisco Field
Office, and the Washington Field Office (WFO). I have been assigned to a counterterrorism
squad at WFO for the past seven years. I have received instruction and training, along with
investigative experience, in methods of investigation relating to identifying terrorist activity
directed against the United States, as well as in identifying the support network for terrorists who
seek to target the interests of the United States and its allies. In the course of conducting or
participating in criminal investigations, I have been involved in interviewing and debriefing
witnesses and informants; conducting physical surveillance; tracing and analyzing internet
protocol addresses; analyzing telephone pen registers; collecting and analyzing evidence; and
preparing and executing search warrants.

2. This affidavit is submitted in support of a criminal complaint charging Syed Ghulam Nabi Fai and Zaheer Ahmad with conspiring to act as an agent of a foreign principal without registering with the Attorney General, and to falsify, conceal, and cover up material facts they had a duty to disclose by tricks, schemes, and devices, in matters within the jurisdiction of agencies of the executive branch of the Government of the United States, in violation of Title 22, United States Code, Section 612, and Title 18, United States Code, Sections 1001 and 371.

3. This affidavit is based on my personal knowledge, my review of records and other materials obtained during the course of this investigation, including intercepted telephone, audio, and in-person communications, as well as information provided to me by other government personnel with knowledge relating to this investigation, particularly including my colleagues at the Washington Field Office of the FBI. Because this affidavit is for the limited purpose of setting forth facts sufficient to establish probable cause, it does not include all of the pertinent facts that I have learned in the course of this investigation.

4. This affidavit summarizes the contents of certain recorded communications, which were recorded pursuant to lawful court orders. Many of these recorded communications were in the Urdu and Punjabi languages. While translators and transcribers have attempted to translate and transcribe the conversations accurately, to the extent that quotations from the communications are included, these are preliminary, not final translations and transcriptions. In most instances, individual identifications are based on names used during the intercepted communications, voice recognition that has been accomplished to date by investigators, historical information developed during this investigation, toll records, physical surveillance, and subscriber information.

2

5. When I describe a telephone call or an email message below, I know of it through court-ordered electronic surveillance and/or records obtained from internet service providers. Many of these telephone calls and emails took place between correspondents in different time zones. As a result, when I specify that a communication occurred on a specific date, it should be construed that the communication occurred "on or about" the date specified.

<div align="center">Background</div>

6. The Inter-Services Intelligence Agency ("ISI"), is a part of the Government of Pakistan and is Pakistan's military intelligence service.

7. The Kashmiri American Council ("KAC") is a non-governmental organization located at 1111 16th Street, Suite 420, in Washington, D.C. The KAC was founded in 1990 and also goes by the name "Kashmir Center." It is one of three "Kashmir Centers" that this investigation revealed are run by elements of the Government of Pakistan;[1] the others are the Justice Foundation/Kashmir Centre located in London, England, run by Nazir Ahmad Shawl, and the Kashmir Centre - European Union, located in Brussels, Belgium, and run by Abdul Majeed Tramboo. In its educational materials, the KAC describes itself as a "not-for-profit organization dedicated to raising the level of knowledge in the United States about the struggle of the Kashmiri people for self-determination." The director of the KAC is Syed Ghulam Nabi Fai ("Fai"), who often works out of his home in Fairfax, Virginia.

---

[1] As set forth below, this investigation has revealed that elements of the Government of Pakistan, including the ISI, have been directly involved with the activities of defendant Fai and that Fai has acted at the direction and with the financial support of those elements of the Government of Pakistan, including the ISI. Hereinafter, when I refer to the "Government of Pakistan," I am referring to those elements, which include the ISI.

8. A confidential witness ("CW-1") provided information to FBI agents in 2005, 2006, and 2010 as part of an attempt to obtain a reduced jail sentence. CW-1 told investigators about a scheme in which he participated to obscure the origin of money transferred by the ISI to Fai to use as a lobbyist for the KAC in furtherance of the interests of the government of Pakistan. CW-1 explained that the money was transferred to Fai through an American citizen living in Pakistan by the name of Zaheer Ahmad ("Ahmad").

9. CW-1 said that he first met Ahmad in the 1980's, when Ahmad was living in the United States, but that Ahmad moved to Pakistan in 1986. CW-1 said that he was introduced to Fai by Ahmad in the mid-1990's. CW-1 said Ahmad told him he needed to get money to Fai in the United States, and that Fai would use it for the Kashmir cause and for lobbying. CW-1 said that he was present for a conversation between Ahmad and Ahmad's accountant in which Ahmad's accountant told Ahmad that he had received $50,000 from the ISI for Fai. CW-1 said that CW-1 agreed to help Ahmad deliver money to Fai. CW-1 said that, from his initial meeting with Fai until approximately 1998, he helped Ahmad transfer approximately $500,000 to Fai.

10. CW-1 explained that, on two occasions, Ahmad told him how much money Ahmad needed to transfer to Fai. CW-1 then set aside that much cash from his own business in $50 and $100 bills in a brown paper bag, and notified Fai that the money was ready for pickup. Fai then picked up the cash at CW-1's office. At about the same time, Ahmad generally would wire transfer funds to CW-1 to cover the cash that CW-1 gave to Fai. Occasionally, Ahmad would hold cash or checks to give to CW-1 in Pakistan.

11. After the second of these transactions, Fai told CW-1 that Fai preferred checks to cash because checks appeared more "legitimate" and "safe." CW-1 then began to send money to

4

Fai via a business acquaintance - - to whom I will refer as "Straw Donor A" - - who agreed to provide checks to Fai in return for CW-1's cash. My investigation has revealed that Straw Donor A was operating numerous businesses and charities at this time, including a foundation.

12. CW-1 showed me three entries from his personal digital assistant ("PDA") which identified transactions in which he sent Straw Donor A money which had originated from Ahmad and was to be passed onto Fai. The first two transactions took place on or about May 8, 1997, and represented a sum of $250,000 sent from Ahmad to CW-1, who in turn passed $225,000 on to Straw Donor A for transmission to Fai. The third transaction took place on February 3, 1998, and was a $100,000 transfer to a Swiss bank account belonging to the aforementioned foundation, which Straw Donor A was to pass onto Fai.

13. CW-1's statements about the money passed to Fai through Straw Donor A are corroborated by copies of checks I found during physical searches of Fai's office and storage facility. Those copies reflect that Fai deposited at least $283,590.61 in checks drawn on Straw Donor A's businesses between 1996 and 1998. In particular, Straw Donor A wrote the KAC a check every week to ten days between March 4, 1997 and April 22, 1997, and again between December 2, 1997, and February 4, 1998. Based on these patterns, I suspect that my physical searches revealed only some of the transactions, and that the total amount passed from Straw Donor A to Fai is much higher than $283,590.61.

14. CW-1 said that he ended his relationship with Fai in approximately 1998, when CW-1's relationship with Straw Donor A deteriorated.

15. Another confidential witness (CW-2) has provided information to the FBI over a long period and proved reliable. CW-2 has known Fai and officials of the Government of Pakistan for

years. Last year, CW-2 told FBI agents that, in approximately 1989, CW-2 was aware of the candidates under consideration to operate the KAC and that the ISI selected Fai to do so because he had no overt ties to Pakistan. CW-2 said that the ISI created the KAC to propagandize on behalf of the Government of Pakistan with the goal of uniting Kashmir. CW-2 estimated that, of the statements Fai makes, 80 percent are provided by the ISI for Fai to repeat and disseminate verbatim. The other 20 percent of the KAC's messaging consists of Fai's own ideas, which have been pre-approved by the ISI but not provided by them.

16. CW-2 further said that the ISI's sponsorship and control of the KAC was secret, and that the ISI has been operating Fai for at least the past 25 years. CW-2 identified Fai's primary supervisor within the ISI as Brigadier Javeed Aziz, who also goes by the nicknames "Rathore" and "Abdullah." CW-2 also identified a photograph of Javeed Aziz Khan, a retired Brigadier General in the Pakistani Army, as Javeed Aziz, also known as ("aka") "Rathore."

17. On March 22, 2007, Fai was interviewed by FBI agents at the KAC office in Washington, D.C. At that time, Fai stated that he had never met anyone who identified himself as being affiliated with the ISI, and did not suspect any associates or acquaintances of being ISI operatives. Further, Fai stated that he was not aware of any ISI presence within the United States, and believed that the ISI did not operate in the United States at all.

18. On March 22, 2010, the Department of Justice sent Fai a letter notifying him that allegations had appeared in the Indian press that he was an agent of Pakistan, and that, if he was an agent of Pakistan, he was required by Foreign Agents Registration Act ("FARA") to register as a foreign agent with the Department of Justice ("DOJ"). After receiving the letter, Fai sent an e-mail from his residence in Virginia to an associate on April 6, 2010, asking him to draft a

response for Fai to send to the DOJ. In a later e-mail to the same individual, Fai added, "Please note that KAC is not doing lobbying. It is doing public relations." FARA requires registration, however, if such public relations are conducted at the direction of the Government of Pakistan.

19. On April 12, 2010, Fai composed a draft of his response to the DOJ letter and emailed it to himself from his residence in Virginia. On April 13, 2010, Fai sent a second draft of his response to a second associate, asking her to make any changes necessary. On April 16, 2010, Fai drove into Washington, D.C., picked up his secretary from the KAC office, and one or both of them caused the letter to be sent to the Department of Justice. In his response, he flatly asserted that he had no obligation to register under FARA because the KAC "has never engaged in activities on behalf of the Islamic Republic of Pakistan or any other foreign entity[ies]." Further, he asserted that

> KAC or I have never engaged in any activities or provided any
> services to any foreign entity. And KAC or I have never had
> written or oral agreements with Pakistan or any other foreign
> entity. Thereafter, this report categorically denies any connection
> to any foreign agent including Pakistan.

20. On March 3, 2011, Fai was interviewed by agents of the FBI at his residence in Virginia. Fai was asked whether he knew anyone in the government of Pakistan. In response, Fai stated that he did, but implied that he had no relationship with anyone in the government of Pakistan by suggesting that none of them knew him.

21. Contrary to Fai's repeated representations to the DOJ and the FBI, the investigation has led me to conclude that Fai has acted at the direction and with the financial support of the Government of Pakistan for more than 20 years. Voluminous evidence independently establishes the essence of what the confidential witnesses told the FBI: that although Fai has some latitude

7

to decide his day-to-day activities, the Government of Pakistan long has directed and funded his lobbying and public relations efforts in the United States.

22. As explained below, the investigation has found that Fai's activities on behalf of the Government of Pakistan have been directed by four individuals: (1) an individual who went by the nickname "Abdullah;" (2) Javeed Aziz Khan, who went by the nicknames "Rathore," "Abdullah," and "Nizami Mir;" (3) Touqeer Mehmood Butt, and (4) Sohail Mahmood, who goes by the nickname "Mir."

23. I know through court-ordered electronic surveillance, as well as internet service provider and telephone company records, that Khan contacted Fai via telephone and e-mail, calling himself "Rathore" and "Nizami Mir," and using the telephone numbers 92-51-9211611, 92-51-9204631, 92-333-5582372, 92-333-5400985, and 92-334-5060793, as well as the e-mail addresses javeed_aziz@ hotmail.com, rathoremail@hotmail.com, and nizami.mir@gmail.com. Between approximately 2006 and early 2011, Khan contacted Fai using these accounts nearly 2,000 times.

24. I know through similar evidence that Butt contacted Fai via telephone and e-mail, primarily using the telephone numbers 92-51-9291068 and 92-306-5528345, and the e-mail address touqeer256@yahoo.com, and that Mahmood contacted Fai via e-mail, using smir69@hotmail.com. All told, Fai has been in contact with his handlers over 4,000 times since June 2008.

25. I also know that Fai's handlers regularly communicate with Ahmad. For example, Ahmad's email account revealed contact information for Khan. Similar information was revealed from an examination of Ahmad's PDA upon his arrival to the U.S. at Kennedy Airport

8

in New York on July 8, 2009. My review of telephone records shows that Khan called Fai numerous times from the same phone number that Ahmad had for Khan. Moreover, Khan and Butt both referred to Ahmad in conversations with Fai, either calling him "the doctor" or "Zaheer."

26. I believe that Fai has received approximately $500,000 to $700,000 per year from the Government of Pakistan, and that the Government of Pakistan has funded Fai's operations through Ahmad. As further discussed below, I believe that the Government of Pakistan money is routed to Fai through Ahmad and a network of other individuals connected to Ahmad. I believe that much of this money is provided to Fai through contacts of Ahmad in the United States because Ahmad lives in Pakistan and is rarely in the United States. The evidence shows that Ahmad arranges for his contacts in the United States to provide money to Fai in return for repayment of those amounts in Pakistan. I believe that these other individuals assist Ahmad in routing money to Fai because doing so ostensibly enables them to take tax deductions for the amounts that they transfer to the KAC as charitable deductions. I estimate that the total amount transmitted from the Government of Pakistan through Ahmad and his funding network to Fai and the KAC since the mid-1990s is at least $4,000,000.

27. My review of Fai's banking records from approximately January 2005 through March 2011, obtained from various financial institutions, indicated that, while the KAC does receive some legitimate donations, the majority of its receipts each year comes from a small network of individuals who are closely associated with Ahmad. Based on records obtained during the physical search of the KAC office, this network has been in place and funding the KAC since at least 1993. These individuals include:

9

| Contributor | Approximate Amount Since 1993 |
|---|---|
| Straw Donor B | $595,193 |
| Straw Donor C | $30,000 |
| Straw Donor D | $132,000 |
| Straw Donor E | $240,500 |
| Straw Donor F | $40,500 |
| Straw Donor G | $96,500 |
| Straw Donor H | $259,639 |
| Straw Donor J[2] | $15,000 |
| Straw Donor K | $267,000 |
| Straw Donor L | $4,000 |
| Medical Group[3] | $158,000 |
| Zaheer Ahmad | $367,700 |

28. To date, neither Fai, Ahmad, nor the KAC has registered as an official agent of the Pakistani or Kashmiri governments with the Attorney General of the United States as required by the Foreign Agents Registration Act., 22 U.S.C. § 612.

A.      1995 Documents and the Public Relations Contract

29. My investigation has established that Abdullah contacted Fai via telephone and facsimile in the mid-1990's. Physical searches of Fai's home, office, and storage facility revealed a number of facsimile documents addressed to Fai and signed "Abdullah," as well as several

---

[2]  Straw Donor J also assisted Ahmad in the transmission of approximately $94,000 in checks drawn off Ahmad's checking account to Fai and the KAC.

[3]  The Medical Group is a medical practice group that includes physicians Straw Donors G and K - - who are separately listed in the chart, above.

documents written by Fai in response to Abdullah's faxes. These documents dated from 1995 to 1997 and contained Abdullah's taskings and requests for information from Fai, as well as Fai's responses. The documents contained numerous references by Abdullah to "our Embassy," by which I believe he meant the Embassy of Pakistan in Washington, D.C. Based on open source information, I know that the ISI officer responsible for handling Kashmiri affairs was identified as "Brigadier Abdullah," and I believe that the documents reflect Fai's contacts with that individual.

30. Among the documents found in the searches was a November 23, 1995 letter from Fai to Abdullah, in which Fai submitted his expenses for reimbursement. The expenses totaled $42,981.45 and appear to have been incurred by Fai in connection with his escort of a visitor to the United States and putting on a program at the United Nations.

31. Another such document, written by Abdullah to Fai on December 7, 1995, reflected Abdullah's criticism of Fai for renewing a contract with a public relations firm without prior authorization, and notified Fai that Abdullah's organization took no responsibility for his unilateral decision to renew that contract.

32. Another document reflected that, the next day, Fai sent a response to Abdullah, and explained that, as part of a strategy to make it appear that the KAC was a Kashmiri organization run by Kashmiris and financed by Americans - - as agreed by Fai and Abdullah's predecessors on March 20, 1990 - - no one from the Pakistani Embassy would ever contact the public relations firm. Fai argued that, even though he had not shown Abdullah the contract itself beforehand, Abdullah had previously told him that Abdullah had gotten the necessary approvals. In requesting Abdullah to reconsider the decision to discontinue the use of the public relations firm,

11

Fai reminded Abdullah of how closely Fai had been working with Abdullah and his predecessors for more than 10 years:

> You are aware that we have been working together for the cause for over a decade now. All these years, I have closely worked with you and others who came before you. It has taken us much time, energy, dedication, strategy, and planning to achieve our common cause.

33. In response to Fai's message, Abdullah wrote Fai on December 13, 1995, that Fai was well aware of the procedural impediments in signing contracts. Abdullah reminded Fai that no financial expenditures would be covered without formal approvals. Abdullah wrote that "we" were unsatisfied with the performance of the public relations firm, and advised Fai to terminate the contract immediately. In specific, Abdullah wrote:

> I once again remind you of my earlier advice that any future financial transactions, contracts, visit, events etc must be forwarded to us for prior approval.

34. This exchange corroborates the information provided by the confidential witnesses, and shows that, as early as 1995, Fai acted at the direction and under the control of his handlers from the Government of Pakistan. While Fai had certain flexibility in carrying out his duties on behalf of the Government of Pakistan, the exchange regarding the public relations contract clearly demonstrates that Fai was not authorized to enter contracts or obligate funds without the prior approval of the Government of Pakistan. Further, the exchange reflects Fai's admission that, as of 1995, he already had been working closely with Abdullah and his predecessors for more than 10 years.

B.   1996 - 2006 Documents, Strategy, and Budgets

1.   KAC's Budgets and Activities

35.  A document located in the searches reflects that, on September 9, 1996, Abdullah provided Fai with detailed instructions for the conduct of KAC's activities.  They included nine items describing how KAC's information should be distributed, and on what KAC's informational activities should be focused.  Another document reflected Fai's response to Abdullah the next day with respect to each of the nine items specified by Abdullah.

36.  In the course of executing the searches, investigators found the "1999 Strategy Document for the Kashmiri-American Council, Washington, D.C. USA" and documents with similar titles for 2000, 2001, 2005, and 2006.  These documents described KAC's plans to provide information to Executive Branch officials, use Congress to highlight the issue of Kashmir, offset the Indian lobby, and increase political pressure on both the U.S. Administration and the Government of India.  For example, the strategy document for the year 2000 stated that KAC's three top objectives were to (1) persuade the administration that self-determination in Kashmir would advance the national interests of the United States; (2)  influence Congress, with the House International Relations and the Senate Foreign Relations Committees being the centerpieces of KAC's advocacy effort; and (3) capture media attention to influence debate on Kashmir, including by staging creative events that draw the press corps to the issue of Kashmir.

37.  The Strategy Document for 2000 detailed KAC's budget requirements for that year to be $490,000, including $80,000 for contributions to members of Congress, $100,000 for a conference, $60,000 for seminars, $50,000 for opinion pieces to be distributed to newspapers across the country, and $30,000 to organize a Congressional trip to Kashmir.  The Strategy

13

Documents for the later years detailed budgets of $455,000 for 2001, $490,000 for 2005, and $719,000 for 2006. Each of the budgets allotted between $80,000 and $100,000 for campaign contributions to members of Congress, as well as significant sums for conferences, seminars, opinion pieces to be distributed to newspapers, and Congressional trips to Kashmir. As described below, I know that Fai provided similar documents to his handlers in 2008 and 2009. As a result, I believe that the documents retained by Fai from 1999, 2000, 2001, 2005, and 2006 were copies of documents that Fai also provided to his handlers.

2.   Seized Balance Sheets Reflecting Receipts from and through Ahmad

38.   Court-authorized physical searches of Fai's residence and storage facility revealed 22 letters written by Fai to Ahmad on a near-monthly basis between December 2003 and April 2006. Those letters contained balance sheets accounting for the monies Fai had received to date during that fiscal year, the identity of the individuals who had sent him money and how much, and the amount Ahmad still needed to send to Fai. They reflect that Ahmad was to transmit approximately $314,500 to Fai in 2003; in 2004, 2005, and 2006, the totals were $505,000, $525,000 and $447,000, respectively. The total amount of money accounted for by the balance sheets during the 29-month period is approximately $1,375,479. I believe that these monies constitute the payments that Fai received from the Government of Pakistan in accordance with his budget requests.

14

39. One of these balance sheets, dated October 8, 2004, reads as follows:

Revenue as of Friday, October 8, 2004

Dear Dr. Zaheer Sahib,

As per letter dated Friday, August 27, 2004, the payable was $415,000.00

| Payment since last report on August 27, 2004 | |
|---|---|
| Brother [Straw Donor B], August 30, 2004: | $ 20,000.00 |
| Brother [Straw Donor B], September 29, 2004: | $ 20,000.00 |
| Dr. Zaheer Ahmed via [Elected Official A] . . . Sept. 29, 2004: | $ 2,000.00 |
| Brother Usman, September 29, 2004: | $ 38,000.00 |
| Dr. Zaheer Ahmed via [Elected Official B] . October 5, 2004: | $ 2,000.00 |
| | |
| Therefore payable as of October 8, 2004:04: [sic] | $333,000.00 |

40. I believe that the two line items regarding Elected Officials A and B in the balance sheet of October 8, 2004, indicate that some of the Government of Pakistan's money to Fai comes in the form of political donations made directly to elected officials. I have examined publicly available campaign finance records (using http://www.fec.gov) and found that, on September 13, 2004, Elected Official A reported receiving a $2,000 donation from Ahmad, and on October 25, 2004, Elected Official B reported receiving a $2,000 donation from Ahmad's nephew, Straw Donor M.[4]

### 3. Fai's Belongings Reflect Contact with Khan

41. On December 23, 2006, customs officers conducted an examination of Fai upon his return to the United States at Dulles Airport. During that examination, an inspection of Fai's personal address book located a telephone number entry of 92-51-921-4631 with the notations

---

[4] I am aware of no evidence that indicates that any elected official who received money from Fai or the KAC was aware that the money originated from any part of the Government of Pakistan.

15

"Rathore" and "home" written adjacent to it, along with the e-mail rathoremail@ hotmail.com.

Fai's mobile telephone also contained an entry in its electronic address book for "Rathore"/Khan,

along with three entries of the aforementioned telephone number in the telephone's call log

history. I know that "92" is the country telephone code for Pakistan, and that the phone number

belongs to an individual identified as Javeed Aziz Khan. According to the Department of State's

Consular Consolidated Database, Javeed Aziz Khan listed that number as his home telephone

number on his application for a visa to enter the United States. Khan also identified

javeed_aziz@hotmail.com as his e-mail address, and "Ministry of Defence" [sic] as his

employer.

> C.     The Denied Request for Reimbursement in 2007

42. On July 20, 2007, Fai e-mailed Khan a request for an additional $45,000 to offset the

costs that Fai had incurred at a conference that he had hosted in Uruguay. The next day, Khan

replied and denied Fai's request:

> Unfortunately based on the understanding given by you when we
> dissuaded you from the said conference, it is impossible to cater for the
> requested demand. As intimated these matters are finalised [sic] much in
> advance and no additional allotment is entertained thereafter.

This e-mail demonstrates that, just as with respect to the public relations contract that was

disapproved by the Government of Pakistan in 1995 even after Fai had entered it, Fai was only

reimbursed by the Government of Pakistan for expenses on projects that were already approved

by the Government of Pakistan.

16

D.    Strategy, Budget Documents, and Activities for 2008

1.    Budget

43.  On or about December 14, 2007, Khan sent Fai an email titled "Performance

Report" which stated:

> An eventful 2007 is coming to an end.  Please forward the executive
> summary of the yearly performance report by the first week of January
> 2008 along with tentative forecast for the year 2008.

44.  In response, on or about January 1, 2008, Fai emailed Khan a document titled

"Strategy Document of KAC / Kashmir Center, Washington, D.C., for the Fiscal Year 2008 and

Review of the year 2007," which contained a complete accounting of Fai's activities for 2007,

including 33 meetings with members of Congress, Congressional staff, the National Security

Council, and the State Department.  In addition, the message included Fai's request for an

operating budget of $741,000 to enable him to distribute $100,000 to members of Congress,

spend $100,000 to organize a conference on Kashmir to be hosted by members of Congress, and

spend $80,000 to organize seminars and lectures on Kashmir at universities and think tanks.

45.  On January 2, 2008, Khan responded to Fai's email with the proposed budget by

email with the comment, "Budget may be marginally increased but not as deasired [sic] by you."

2.    Taskings

46.  On or about April 5, 2008, Khan sent Fai an e-mail which said, "Following are the

details of the Sony 13.3 inch laptop bag. A picture of the bag is also attached with this email.

Kindly procure and send it with someone as soon as possible.  ABDULLAH IS EATING MY

HEAD."  Khan sent a second e-mail on or about April 7, 2008, in which he said, "Kindly note

17

that Abdullah needs a laptop bag and adapter." I believe that these messages reflect that Abdullah was Khan's superior, and provided taskings for Khan to pass on to Fai.

47. On May 28, 2008, Khan told Fai that Fai would be receiving an invitation to attend a conference in Kampala, Uganda. On June 5, 2008, Fai e-mailed Khan that he had a conflict with the Uganda conference, because he also had been invited to a dinner with members of Congress and Elected Official C, and asked Khan which event he should attend. On June 5, 2008, Khan e-mailed Fai that the dinner was more important. I know that Fai attended that dinner rather than the conference, because I have seen a photograph of him at the dinner.

48. In April and May 2008, Khan sent Fai three e-mails asking Fai to highlight the issue of mass graves recently discovered in Indian-controlled Kashmir. Fai then raised the topic at his Ninth International Kashmir Peace Conference, held on Capitol Hill in July 2008, and sent a letter to UN Secretary General Ban-ki Moon that mentioned mass graves.

49. On June 18, 2008, Fai e-mailed Khan the list of individuals that Fai had invited to the KAC's Conference scheduled for July, and asked Khan to provide Fai with a list of invitees from India and Pakistan. The next day, Khan sent him a list of Indian nationals for Fai to invite, and promised to send him a similar list of Pakistani nationals a day or two later. On June 25, July 3, and July 7, Fai and Khan e-mailed and spoke about possible Pakistani and Indian invitees. The conference was held on Capitol Hill on July 31 and August 1, 2008. I obtained a list of the speakers at the conference. Among the speakers were six individuals whose names had been provided to Fai by Khan. I conclude from this that Fai invited the individuals that Khan directed him to invite.

18

50. On August 24, 2008, Khan wrote Fai that he should "kindly interact with law makers in your area of responsibility and brief them of the latest/current imbroglio in occupied Kashmir." Khan emphasized that the problem in Kashmir was about the denial of the right of "self determination" and wrote that Fai should "kindly keep me posted in this regard." Three days later, Fai responded to Khan's tasking with an e-mail saying, "We have initiated this campaign in the United States." Fai described his meeting with representatives of the National Security Council, and reported that he had requested a meeting with the State Department. On September 17, 2008, Fai e-mailed Khan and reported that he had met with the Assistant Secretary of State for South Asian Affairs, and that Fai had provided copies of statements by Indian intellectuals and human rights organizations regarding Kashmir.

3.    Funding

51. On February 22, 2008, Ahmad directed Straw Donor J to send four checks to the KAC, each for $7,500 and dated February 1, 2008, February 7, 2008, February 14, 2008, and February 26, 2008. Attached to this message was an undated message from Straw Donor J's wife, in which she asked Ahmad whether she and Straw Donor J could use tax rebates that Ahmad was not using for the current tax year. In response to that message, Ahmad instructed her to send a check to the KAC, providing the name and mailing address of Dr. Ghulam Nabi Fai, 3770 Penderwood Drive, Fairfax, VA. Ahmad also included Fai's cell phone number and added, "Make a note that it is with ref. to Dr Zaheer Ahmad." By an email message later that day, Straw Donor J notified Ahmad that he had sent the checks to Fai.

52. On June 19, 2008, Fai told Khan that he needed "half a dozen Brylcreem" and that it would be great to have a meeting with "the doctor." Khan responded that he had made a note

19

about the "Brylcreem" and suggested that such a meeting might happen in July. As explained

below, quantities of "Brylcreem" was the subject of discussion between Khan and Fai in 2009 as

well. On the basis of the investigation described in this affidavit, I believe that the reference to

"the doctor" refers to Ahmad, and Fai's request for "half a dozen Brylcreem" is code for $60,000.


          E.      Strategy, Budget Documents, and Activities for 2009

             1.     Budget

     53. On December 12, 2008, Khan sent an e-mail to Fai, in which he wrote "[k]indly send

tentative program pf [sic] events for 2009 by 19th December." On December 18, 2008, Fai

responded by e-mailing a document titled "Plan of Action of KAC/Kashmir Center for Fiscal

Year 2009." This document laid out Fai's intended strategy to secure Congressional support to

encourage the Executive Branch to support self determination in Kashmir, build new alliances in

the State Department, the National Security Council, the Congress, and the Pentagon, and to

expand KAC's media efforts. Fai also set forth KAC's projected budgetary requirements of

$738,000 for 2009, including $100,000 for contributions to members of Congress.

     54. On December 19, 2008, Khan notified Fai by e-mail to reduce his budget request:

> In view of the prevailing environment there can be no increase therefore
> kindly revise the budgetary requirements curtailing where possible. A
> major cut is not necessary but some adjustments may be required in order
> to meet the essentials.

I believe that the "prevailing environment" mentioned by Khan refers to the unrest and economic

issues within Pakistan occurring in late 2008.

55. That same day, Khan sent Fai another message acknowledging the report sent by Fai the previous day, and adding, "there is a requirement for monthly Tentative Calender (sic) of events, kindly send it by 23rd December." On December 22, 2008, Fai responded to Khan's tasking, stating, "Here is the e-mail as required." Attached to Fai's message was a document titled, "KAC/Kashmir Center, Washington, D.C. Tentative Calendar of Events 2009." The document listed the planned activities for KAC for 2009, including nine events to brief Members of Congress and staffers, as well as four events involving incoming White House and Administration officials. It also included a budget request for $638,000 for 2009. I believe that Fai lowered his budget request to $638,000 from $738,000 - - as initially requested in his e-mail of December 18, 2009 - - as a result of Khan's message on December 19, 2008, calling for Fai to adjust his budget.

2.    Taskings

56. On December 31, 2008, Khan e-mailed Fai a request that Fai formulate programs to respond to claims by India that the large turnout in recently concluded elections was an expression by Kashmiris of their approval of Indian rule. Five days later, Fai sent Khan and several media outlets a press release asserting that the elections in Kashmir were illegitimate and not even a first step towards the resolution of Kashmir dispute.

57. On January 21, 2009, Khan called Fai to request that Fai provide him with the topics and themes of all events he was planning for 2009. Khan told Fai that he wanted to coordinate everything ahead of time. The next day, Khan reiterated his need for the information through an e-mail to Fai. On January 23, 2009, Fai responded to Khan with 18 proposed speech themes regarding various aspects of the Kashmiri conflict.

21

58. On February 11, 2009, Khan sent Fai an e-mail directing him to send Khan a "detailed performance report for the year 2008." Khan reiterated that directive with a second e-mail on February 26, 2009. On February 26, 2009, Fai responded with an e-mail which listed events and speaking engagements that Fai had scheduled; he added that he would send the full report to Khan by or before March 6, 2009. On February 27, 2009, Khan responded that it was acceptable for Fai to send his detailed performance plan by then. On March 4, 2009, Fai completed his response with a document that described Fai's activities throughout 2008, including press releases, letters to President-elect Obama, and details of Fai's participation in various events.

59. On February 13, 2009, Khan e-mailed Fai a list of discussion topics for KAC to use in its 2009 conference. On February 17, 2009, Khan called Fai to discuss the conference, and obtained Fai's acknowledgment that he had received the e-mail containing the topics and themes that Khan wanted presented. I examined the agenda created by Fai for the July 2009 Kashmir Peace Conference and found that six of the ten sessions comprised topics sent by Khan.

60. On April 9, 2009, Khan e-mailed Fai an article about a Kashmiri expatriate in Canada pressuring the government to make a statement about Kashmir. Khan noted that "Similar efforts by all of us will help to highlight the issue internationally." On April 20 and 21, 2009, Fai faxed letters to numerous members of Congress, requesting them to raise the subject of Kashmir with the Secretary of State during her Congressional testimony on those days. I believe that, in doing so, Fai acted in response to Khan's tasking to attempt to get a U.S. official to make a statement on Kashmir.

22

61.  On May 11, 2009, Fai e-mailed Khan a request for approval to invite 12 Pakistani politicians, scholars, and journalists to KAC's July conference.  The next week, Khan responded with a listing of eight individuals, only three of whom had been on Fai's list.  The same day, Fai told Khan that he would invite the individuals Khan suggested, and asked Khan in which session Khan wanted them to be included.  Fai asked for Khan's approval for the invitation of several other individuals, which approval Khan gave hours later.  Similar exchanges occurred between June 20 and June 23 with respect to speakers for the panels and reporters to be invited to cover the conference.  These exchanges illustrate that Khan controlled who Fai invited to his events, and whose perspective he solicited for display in public forums.

62.  On July 17, 2009, Khan e-mailed Fai a detailed outline for the format of a briefing about the history and goals of KAC which Fai was to provide during the upcoming visit of a Pakistani dignitary.  I believe that Khan referred to the upcoming visit of Major General Mumtaz Ahmad Bajwa, who in late 2008 had been placed in command of the ISI's Security Directorate, which oversees Kashmiri militant groups.

63.  The Tenth International Kashmir Peace Conference was organized by Fai and the KAC and held in Washington, D.C., on July 23 and 24, 2009.  At that conference, Fai was observed talking with Lieutenant Colonel Touqeer Mehmood Butt.  According to the Department of State's Consular Consolidated Database, Butt listed his employer in his application for a visa to enter the United States as "Pakistani Ministry of Defence [sic], Inter-Services Intelligence (ISI), Islamabad, Pakistan."  Attached to the visa application was a letter on ISI letterhead which affirmed that Butt was an employee and would be traveling on official business.  As noted above,

23

I believe that Touqeer Mehmood Butt has been one of the Government of Pakistan's handlers for Fai.

64. Major General Bajwa was also observed at that conference. On or about July 25, 2009, court ordered electronic surveillance recorded a meeting between Bajwa, Butt, and Fai at KAC. Fai provided Bajwa with a briefing which closely hewed to the outline earlier provided by Khan. His comments included the history of the establishment of KAC; KAC's primary lobbying targets within the U.S. (to wit, White House, State Department, Pentagon, Congress, and the United Nations); KAC's prior encounters with U.S. and Pakistani politicians; and Fai's relationship with the Pakistani Embassy in Washington.

### 3. Funding

65. As noted above, Straw Donor G has, since 1993, provided KAC with at least $96,500. On December 2, 2008, Straw Donor G told Fai that he had spoken to "Doctor Zaheer" and, on his suggestion, had sent a check to Fai for $25,000. I have examined bank records for KAC and know that on December 5, 2008, Fai deposited a check from Straw Donor G for $25,000. I believe that Straw Donor G was referring to Zaheer Ahmad when he said "Doctor Zaheer." In light of the other evidence detailed in this affidavit, I believe that Straw Donor G accepted Ahmad's "suggestion" to send Fai a check for $25,000 because Straw Donor G would (1) get a tax deduction for ostensibly donating money to KAC; and (2) be reimbursed by Ahmad in Pakistan.

66. On January 28, 2009, Khan told Fai that he would try to see the doctor during the week at 1:50, and repeated later in the conversation that he would see the doctor within the week. I believe that "seeing the doctor" refers to seeing Ahmad, and that this conversation was a

24

conversation regarding money using coded language. I believe that the phrase "visiting the doctor" is coded language for "arranging money to be sent by Ahmad to Fai," and that the reference to "1:50" represents the amount $150,000.

67. According to an intercepted conversation, on March 24, 2009, Ahmad told Fai that Fai had provided a receipt to Straw Donor C for only $1,500 even though Fai had received a check from Straw Donor C in the amount of $15,000, and requested that Fai provide Straw Donor C with a receipt for the correct amount. I have reviewed the banking records for the KAC accounts and know that on December 3, 2008, Fai deposited a check written by Straw Donor C on November 14, 2008 to the Kashmiri American Council for $15,000. I believe that the receipt was important to Straw Donor C because Straw Donor C wanted to substantiate a charitable deduction, even though Straw Donor C was getting reimbursed for that transfer from Ahmad in Pakistan.

68. On May 6, 2009, Straw Donor B told Fai that the person who had given him a check for $5,000 had been calling him repeatedly and insisting that the check had not been cashed. Although I do not know to whom Straw Donor B was referring as the person who gave him the check, I believe Straw Donor B was referring to Ahmad. In any event, Straw Donor B's statement corroborates my conclusion that the money that Straw Donor B transferred to Fai was not Straw Donor B's own.

69. On May 14, 2009, Ahmad emailed an individual in Turkey named Serdar that he had transmitted $15,000 to Serdar's account, and that Fai would shortly contact Serdar in Turkey. On May 18, 2009, Ahmad told Fai by telephone that he had sent "fifteen copies" to Serdar. The next day, Ahmad told Fai by telephone to call Serdar and that Serdar would "give it" to Fai. I believe

25

that Ahmad's reference to "fifteen copies" was code for the $15,000 that Ahmad had previously

transmitted to Serdar. On May 21, 2009, Ahmad emailed Serdar to give $14,975 to Fai when Fai

called on Serdar. The next week, Ahmad received an email confirming that approximately

$14,975 was provided to Fai.

  70. On July 8, 2009, a search of Ahmad's property upon his arrival at Kennedy Airport

revealed a balance sheet covering June and July 2009, reflecting that KAC was paid

approximately $6,400 on June 6, 2009, and another $6,000 on June 13, 2009. Also noted on the

balance sheet were the names of Straw Donor F and others who I believe are involved in

Ahmad's funding network comprised of U.S.-based Pakistani doctors and businessmen.

  71. On August 4, 2009, Fai discussed funding and budget requirements with Ahmad.

Fai informed Ahmad that, in order to cover Fai's expenses for August through October 2009, he

would need an additional $150,000. Ahmad responded that it could be arranged, and asked

whether that included everything, and whether it was in addition to "60." Fai answered that it

was in addition, and then said, "two." Ahmad said that it will make it "two." I believe "two" in

this context refers to $200,000.

  72. Multiple phone conversations during the next two weeks involved Ahmad's efforts to

get money to Fai. For example, on August 4, 2009, Ahmad told Straw Donor G that he had a

good meeting with "the father" and that "the father" had told him that money [was] needed in

Washington. Straw Donor G asked whether it was to be sent to the "Kashmiri American," and

Ahmad affirmed that it was. Straw Donor G said he would send "25" to the Kashmiri and

confirmed that his father would receive "20" from Ahmad in Pakistan. Ahmad agreed and asked

whether Straw Donor G could instead send 30. Straw Donor G pledged to send at least 25. This

26

exchange demonstrates that Straw Donor G expected that his family members would be reimbursed for any monies he sent to KAC at Ahmad's behest.

73. Hours later, Ahmad asked Straw Donor K to send about "25" to Fai (as noted above, Straw Donor K is a partner of Straw Donor G in the Medical Group - - who, since 1993, has provided KAC with at least $300,000). On August 12, 2009, Ahmad told Fai that he had spoken to Straw Donor G, and that Straw Donor G was supposed to send Fai "25" to Fai's home. Ahmad said that he would ask Straw Donor K to bring Straw Donor G's money when he was due to come to New York shortly. Fai then asked Ahmad to do "about 50" and Ahmad said that he would try. Ahmad then spoke with Straw Donor G and requested that Straw Donor G send the check to Fai immediately.

74. On August 5, 2009, Ahmad told Straw Donor B that he had given Fai money the previous day but Fai needed approximately 40 to 50 more, and asked Straw Donor B to find a way to collect $50,000 and send it to Fai. On August 10, 2009, Ahmad told Fai that he had spoken to Straw Donor B and was also making efforts himself. Ahmad told Fai he was going to ask Straw Donor F and one other individual to do something for Fai. I believe that, by telling Fai he was going to ask Straw Donor F and another individual to do "something," he was telling Fai that he was going to ask them to transfer money to Fai in return for reimbursement in Pakistan.

75. On August 10, 2009, Ahmad asked Straw Donor D for up to $15,000 in cash for Fai, and promised to repay Straw Donor D quickly. Ahmad asked whether Straw Donor D would take Ahmad's check and enter it in his books as a loan. Two days later, Ahmad told Fai that he could get money from Straw Donor D. Ahmad gave Fai Straw Donor D's phone number, and added that he would tell Straw Donor D to expect a call from Fai, to give him whatever money

27

he had, and try to arrange more as well. Two hours later, Straw Donor D spoke with Ahmad and advised that Fai was with him, then handed Fai the phone. After Fai and Ahmad discussed a check from Straw Donor G, Fai asked Ahmad to do "about 50" in New York, and Ahmad promised to try.

76. On August 13, 2009, Fai left a voice-mail for Ahmad, asking Ahmad to speak to Straw Donor K because the envelope he had received from Straw Donor K was empty. Later that day, Straw Donor K told Ahmad that he had forgotten to put the check in the envelope but would bring it to Ahmad. On August 17, 2009, Ahmad told Fai that Straw Donor K had made a mistake but would send the check shortly.

77. I reviewed banking records for KAC and know that on August 25 and September 2, 2009 Fai deposited three checks written on the Medical Group account totaling $27,000, with "donation" for Straw Donor K or Straw Donor G written on the memo lines.

78. On August 30, 2009, Khan e-mailed Fai that Khan "saw the doctor" and that "[the doctor's] consultation fee has increased by rupees 150." I believe that Khan's use of the phrase "saw the doctor" is a coded reference to the fact that Khan had spoken with Ahmad, and approved the funding request that Fai made to Ahmad for $150,000 on August 4, 2009.

79. On September 12, 2009, Straw Donor H emailed Ahmad to inform him that he had sent Ahmad copies of the checks from Straw Donor H's account made out to KAC for a total of $23,000. I have reviewed Fai's bank accounts and I am aware that Fai deposited two checks from Straw Donor H for a total of $14,000 in September and October 2009.

80. On October 6, 2009, Khan emailed Fai a message which said, "157 pages draft of the last addition of the Medical Journal is being sent for editing. You may like to talk to the doctor."

28

Fai sent a response stating, "I will contact him." The next day, Khan asked Fai whether Fai was able to talk to the "people from the magazine," and Fai said that he had talked to them. Khan then asked whether that was "the last edition of this year." I believe that Khan was referring to Ahmad when he mentioned "the doctor," and that the statement regarding the "157 pages draft" is likely coded language for $157,000. Similarly, I believe that Khan's query as to whether it was the "last edition" was intended to elicit whether Fai and Ahmad had any more financial installments pending.

81. On October 10, 2009, Ahmad discussed with Straw Donor B a plan for Straw Donor B to give Fai another $25,000 in cash the next day. On October 22, 2009, Straw Donor B told Ahmad that he had already paid Fai "24,500" and was going to give him "15,800" later that day.

82. Also on October 22, 2009, Khan asked Fai if Fai had received all of the goods. Fai said that he had received everything except "Brylcreem, 75 milligram." Fai then asked Khan to bring with him to London "two or three pieces of Brylcreem." I believe that this conversation is coded language for the funding that Fai receives from the Government of Pakistan. Accordingly, I believe that "Brylcreem, 75 milligrams" is code for $75,000 that Khan was providing to Fai through Ahmad's network. Further, I believe that Fai's request that Khan bring "two or three pieces of Brylcreem" with him to London is coded language that Khan bring $20,000 to $30,000 to London.

83. On November 10, 2009, Ahmad told Straw Donor F that he had been pursuing Straw Donor G and had spoken with Straw Donor G's father about his finances. Straw Donor G's father had told Ahmad that they already donated $75,000 in 2009, and wanted to defer an additional $50,000 to January 2010. Ahmad told Straw Donor F that for the "25" that Straw

Donor G had sent to him, Straw Donor G gave five and got money back for the rest. I believe that this conversation illustrates that Ahmad provides cash to his straw donors to reimburse them for the donations made to Fai that Ahmad directs them to make.

84. On December 3, 2009, Straw Donor C told Ahmad that he had not sent "it" to Straw Donor F yet. He added that "15" was still left out of a total of "25," and that he had sent $15,000 to Fai. He added that he had sent $15,240 to Straw Donor F, for a total of $30,240. From my review of KAC's banking records, I know that on October 14, 2009, Fai deposited a check written by Straw Donor C to KAC for $15,000. I believe this is the $15,000 mentioned by Straw Donor C in the above call. I believe this conversation indicates that Straw Donor C was not sending his own money to Fai as a charitable donation, but was rather receiving some or all of it back.

85. On Tuesday, December 8, 2009, Ahmad told Straw Donor B to tell Fai to delay his visit for a couple of days, because Straw Donor N had said that he could give them $30,000 by the following Friday or Saturday. On Saturday, December 12, Straw Donor B told Ahmad that Straw Donor N had given him $30,000, and that he would give Fai $40,000. Approximately 90 minutes later, Fai told Ahmad that he was with Straw Donor B, and thanked Ahmad. Fai then reminded Ahmad that Ahmad had agreed to arrange checks for Fai totaling $100,000, and reiterated that he needed it before December 31. I believe that Fai thanked Ahmad for the money that Straw Donor B had just given him.

86. On December 19, 2009, Ahmad directed Straw Donor J to write a check for $10,000 to KAC and date it for January 2010.

30

87. On December 21, 2009, Ahmad told Straw Donor B that he had sent some money for Fai, and asked Straw Donor B to tell Fai that Ahmad had arranged for "10 in New York with [Straw Donor D]." I believe that, in this conversation, Ahmad told Straw Donor B to tell Fai that he could pick up $10,000 from Straw Donor D in New York.

### G. 2010 Budget, Activities, and Funding for 2010

#### 1. Budget and Activities

88. On September 18, 2009, Khan directed Fai by email to submit his budget request for 2010. In doing so, Khan added, "The requirement should be lesser than 2009 as in no circumstance higher requirement will be possible." Fai responded to this tasking on September 23, 2009, with a document titled "Plan of Action of KAC/Kashmir Centre, Washington D.C., for the Fiscal Year 2010." This document, like the 2008 and 2009 action plans, listed Fai's plans to attempt to influence the United States government, and itemized KAC's 2010 budget request of $658,000.

89. On or about December 18, 2009 Khan sent Fai an email which stated, "Kindly note that with immediate effect please correspond on affairs of your centres/offices with Mir Sahib whose e-mail address is as follows - smir69@hotmail.com." Based on emails I have examined, I believe that the account holder is Sohail Mahmood. Accordingly, I believe that Khan's December 18 message reflected his notification to Fai that Sohail Mahmood, also known as "Mir," replaced Khan as Fai's handler for the Government of Pakistan.

31

90. On January 4, 2010, Fai sent Khan an email which said that Fai had been trying to reach Khan on both his cell phone and home phone, with no success. I believe that Fai's inability to reach Khan is attributable to Mahmood's replacement of Khan as Fai's handler.

91. On January 13, 2010, Mahmood sent Fai an e-mail directing Fai to forward a summary of his planned activities for 2010. Fai responded to this tasking with an e-mail on January 16, 2010 which attached a document titled "KAC/Kashmir Center Proposed Activities in 2010." This document listed the 61 events that KAC planned for the year, including ten briefings for, or events with, members of Congress and/or their staff.

92. On January 28, 2010, Mahmood sent Fai an email which stated that Mahmood and "Khan Sahib" would be traveling to Geneva in March and expected to see Fai there. (I believe "Khan Sahib" is an alias for Major General Mumtaz Ahmad Bajwa, who was then in charge of the ISI's Security Directorate.) Mahmood further directed Fai to provide him with an accounting of how his budget was spent in 2008 and 2009. On March 9, 2010, Fai provided Mahmood with a document detailing his expenses, which he claimed totaled $690,380 in 2008 and $662,730 in 2009.

93. On February 3, 2010, Khan sent Fai an email announcing that he had moved permanently to Lahore, Pakistan. On February 14, 2010, Khan telephoned Fai and asked whether he was talking to "Mir Sahib" (by whom I assess he meant Mahmood). Fai responded that he spoke with Mahmood only once on the telephone, but stayed in touch via email. I believe that this message confirms that Mahmood replaced Khan as Fai's handler.

94. On March 10, 2010, Touqeer Mehmood Butt called Fai from Pakistan, saying that Mahmood had asked him to maintain contact with Fai. The two discussed individuals who Fai

32

could invite to participate in KAC's conference in July 2010 on Capitol Hill. At one point, Butt advised Fai that it would "take time for Mir Sahib to understand things because he is new." This message, as well, confirms that Mahmood replaced Khan as Fai's handler.

95. On March 20, 2010, Customs officers conducted an examination of Fai upon his return to Dulles Airport from Switzerland. During this examination, Fai was found to possess a calendar which contained the entry "Dinner with Khan and Mir" for March 16, 2010, as well as what appear to be the notes of a meeting with Mir. The first section of the notes reads, "U.S. understanding: 5 elements – E.B., State, DoD, WH; Media; Think tank; Congress; U.N." A later section reads, "K Conference; Universities/College Seminars; Congressional hearings; Congressional briefing." I believe that "E.B." refers to the Executive Branch, that "WH" refers to the White House, and that "K Conference" refers to KAC's annual Kashmiri Conference held on Capitol Hill. Based on the calendar entry and the notes, I believe that Fai met with Mahmood and Bajwa while in Switzerland, and discussed KAC's strategy for 2010. Further, I believe the notes represent the topics they discussed, including KAC's intended lobbying targets and the vehicles through which Fai intends to lobby in the coming year.

96. On April 21, 2010, Mahmood sent Fai an email which directed Fai to plan to attend a meeting of the Organization of the Islamic Conference in May 2010 in Dushanbe, Tajikistan. On April 23, 2010, Fai asked Butt which flights he should choose for his trip. On April 26, Butt notified Fai of his approval of Fai's flights and wrote, "Your expances [sic] at DUSHENBE are catered for including air fare."

97. On May 13, 2010, Fai spoke with Khan and discussed the new man "in charge of the library in Islamabad." I believe "the library in Islamabad" refers to the ISI's Security Directorate,

33

and that Khan and Fai referred to Mahmood as "the new man." Khan and Fai also discussed "Tall Khan," whom Fai said he met in Geneva: I believe that Khan and Fai were using "Tall Khan" to refer to ISI Major General Mumtaz Ahmad Bajwa. Khan advised Fai that "Tall Khan" had retired on April 30, 2010, and added that he had badly damaged "the movement" and angered everyone, including Khan himself. Finally, Khan and Fai spoke about Khan's retirement plans: Fai suggested that Khan write a book, and Khan responded that he could not write a book because of the nature of his work.

98. On July 24, 2010, Fai sent an email to one of his assistants asking whether she had purchased name tags. Between July 25 and 27, 2010, Fai sent her several lists of names and affiliations; among them was the entry "Mr. Touqeer Mehmood, Washington, D.C." I believe this entry indicates that Fai expected Butt to attend the conference, as he had done in 2009. On July 28, 2010, Butt entered the U.S. at John F. Kennedy International Airport. According to the Department of State Consular Consolidated Database, Butt reported that his trip was being paid for by "Directorate General ISI," and that he would be staying at the Embassy of Pakistan in Washington, D.C. On August 6, 2010, Fai and Butt had a conversation in which Fai asked how Butt's journey had been from Washington, D.C. to Pakistan. I take all these facts to indicate that Butt entered the U.S., traveled to Washington, D.C., and attended Fai's Kashmir Peace Conference.

2. Funding

99. On January 18, 2010, Ahmad told Straw Donor B that he would attempt to get "one or two additional checks from some doctors for Fai." The next day, Straw Donor B indicated to Ahmad that Fai had picked up $34,000.

34

100. On January 31, 2010, Straw Donor G's father told Ahmad that Straw Donor G was unable to help Ahmad due to circumstances in Pakistan. Ahmad replied that the situation in Pakistan had no bearing on the situation, as he would personally pay back the money. Ahmad said that he had always fulfilled his promises and that, if Straw Donor G said to, Ahmad could pay the money back in the U.S. This conversation further establishes that Ahmad reimburses the straw donors in Pakistan for the monies that they transfer to Fai in the United States.

101. On February 10, 2010, Ahmad instructed Straw Donor B to give Fai $50,000. On February 20, 2010, Straw Donor B told Ahmad that Fai asked Straw Donor B to give Fai the money the next day in New York. On February 21, 2010, Straw Donor B told Fai that he would meet Fai at Fai's hotel room shortly. I believe that Straw Donor B gave Fai at least $50,000 from Ahmad at that meeting.

102. On February 17, 2010, Straw Donor C told Ahmad that he had sent "forty" to Straw Donor F and would be sending another check in two weeks, to make a total of "fifty." Straw Donor C told Ahmad that when he travels he might need one to one and a half million rupees. Straw Donor C also wanted Ahmad to give "five" (presumably five lakh, or 500,000 Pakistani rupees) to his nephew, who would be getting married in March. I believe that this call illustrates that Straw Donor C sent money to Ahmad with the understanding that he would be reimbursed for it in Pakistan.

103. On March 6, 2010, Ahmad asked Straw Donor C whether he had sent the check, and Straw Donor C replied that he had sent one check for $45,000 "direct" and has another for $5,000 "secretly." Ahmad directed Straw Donor C to date the $5,000 check for 10-15 days in the future and to send it. Straw Donor C then told Ahmad that he would be traveling to Pakistan and

35

would need to get the cash from Ahmad when he was there. He added that the accounting for "that cash" would be separate, and Ahmad replied that it would be fine. This call illustrates that Straw Donor C sent money to Ahmad with the understanding that he would be reimbursed for it in Pakistan.

104. On March 20, 2010, Ahmad instructed Straw Donor B to give Fai at least $30,000 so that Fai would be satisfied for a month or so. Straw Donor B commented that a lot of money was going to Fai this time, and Ahmad chuckled and replied "Long live Pakistan."

105. On March 25, 2010, Fai emailed Ahmad a receipt from KAC for Ahmad's donations totaling $32,500 during 2009, through at least five separate checks. The next day, Ahmad emailed Fai a message stating that the receipt Fai sent previously did not appear to be accurate. Ahmad then provided a list of five other checks to KAC from Ahmad totaling $39,000. Fai responded on March 26, 2010, with a receipt for $39,000 that listed the five checks referenced in Ahmad's earlier email. Bank records for Ahmad's account reflect that at least two of those checks were not deposited into a KAC account but instead were used to pay Fai's home mortgage. As a result of Fai's personal use of Ahmad's ostensible contributions to KAC, I believe that KAC's bank records understate the amount of money that Fai received from Government of Pakistan through Ahmad and others.

106. On April 4, 2010, Butt emailed Fai that "Meeting with friend Zaheer is likely to be held soon, date cannot be confirmed," and nine days later, sent another message stating that he had contacted "Mr. Zaheer" successfully. I believe that this message indicated that Fai's next funding installment was approved and would soon begin to make its way into Fai's accounts through Ahmad's contacts.

107. On April 11, 2010, Straw Donor B told Ahmad that he had approximately $10,000 to give to Fai. Straw Donor B said that Fai usually calls and then comes alone to get the money.

108. On April 27, 2010, Ahmad told Fai that Straw Donor B had some money for Fai, and that he had spoken with both Straw Donors H and K, and that they would be sending something for Fai. Ahmad also said that he had met another individual, for "hundred and sixty." I believe that Ahmad was referring to Ahmad's meeting with Butt, and that "hundred and sixty" represents the $160,000 that the Government of Pakistan approved Ahmad to send to Fai.

109. On June 8, 2010, Fai requested that Ahmad contact Straw Donor G, Straw Donor K, and several others, adding that he wanted Ahmad to tell them to use FedEx because he needed the money urgently. On June 14, 2010, Fai told Ahmad that he had not yet received "the envelope" yet, and reminded Ahmad to speak to Straw Donors G, H, and K.

110. On June 29, 2010, Fai was stopped by police in New York and found to have in his possession $35,000 in cash. Fai told the police that he had just received the cash from Straw Donor B as a contribution to KAC.

111. Shortly after being stopped, Fai called Straw Donor B and told him that the police had stopped him, searched his car, and found the money. The next day, Fai and Straw Donor B spoke again: Straw Donor B told Fai that Ahmad had suggested they claim to have gathered the money from a particular mosque in Brooklyn, New York. On July 1, 2010, Fai told Ahmad that he had told the police that it was the first time he had received money from Straw Donor B, and that the money had been raised in New York by Pakistanis and Kashmiris to support Fai's upcoming KAC conference.

37

112. On July 7, 2010, Ahmad told Fai that he wanted Fai to stick with the story that they had created, namely that the congregation of the Brooklyn mosque had raised the funds and provided them to Straw Donor B to give to Fai. Fai agreed to maintain that story. The same day, FBI agents interviewed Straw Donor B at his residence. Straw Donor B told the interviewing agents that the money had been raised by members of the Brooklyn mosque and that Straw Donor B had volunteered to pass the money along to Fai. Straw Donor B further stated that this was the first and only time he had given money to Fai, and that Fai had directed him to go to the mosque and pick up the money from a particular imam there.

113. On August 12, 2010, FBI agents interviewed the imam of the mosque identified by Straw Donor B, who advised them that he had been in Pakistan from April through July 2010. I have reviewed the imam's travel records and know that he was indeed out of the U.S. during the time period in question. When the agents interviewed Straw Donor B a second time, he again claimed that the imam had provided him the money in late June 2010 to give to Fai. I believe that Straw Donor B lied during both interviews with the FBI in order to conceal the true source of the cash.

114. On August 12, 2010, shortly after the FBI agents had left his residence, Straw Donor B spoke with Ahmad and complained that Fai had not told the imam of their cover story. Ahmad promised to talk to Fai, and cautioned Straw Donor B not to use his own phone to call Fai. Ahmad also directed Straw Donor B to provide Fai with an additional $30,000 in cash.

115. On August 14, 2010, Ahmad told Straw Donor B that he had just met with "the people who are involved here" for one to two hours to discuss Straw Donor B's encounters with the FBI. Ahmad said that "they" told him to tell Straw Donor B to maintain the same cover

38

story, and not to involve any additional people. I believe that Ahmad's reference to "the people who are involved here" and "they" referred to his contacts in the Government of Pakistan.

116. On August 29, 2010, Ahmad and Straw Donor B had a conversation in which Straw Donor B told Ahmad that he had given the money to the imam of the Brooklyn mosque, and that the imam had not yet met "the doctor." I believe that Straw Donor B's reference to "the doctor" was a reference to Fai, and that, based on the context of the call, this conversation refers to different money than the cash that was seized on June 29, 2010. Further, I believe that Straw Donor B provided the new cash to the imam to give to Fai instead of giving it to Fai directly so that Fai could say without fear of contradiction that he received it from the imam in case the police stopped Fai and found him with cash again.

117. In a conversation on November 4, 2010 between Ahmad and Straw Donor G, Ahmad requested Straw Donor G to "take advantage" and send $10,000 to "the Kashmiri"; Straw Donor G responded he would talk with Straw Donor K about it. I believe when Ahmad said "take advantage" in this conversation, he was instructing Straw Donor G to take a tax deduction, even though both Ahmad and Straw Donor G knew that Ahmad would reimburse the money. I further believe that when the word "Kashmiri" was used, this was coded language meant to refer to Fai.

118. On December 15, 2010, Fai requested that Ahmad arrange for "people like [Straw Donor H, Straw Donor K], and others" to send checks. Fai specified that he wanted the checks to be sent "toward 2010 tax returns." The same day, Ahmad spoke with both Straw Donor H and Straw Donor K. Ahmad reminded Straw Donor H of the money he had planned to send, and specified that he meant "the one you usually send to the Kashmiris." Straw Donor H told Ahmad

39

he had just sent money in August and had no more to send. Ahmad then had a conversation with Straw Donor K in which Ahmad instructed Straw Donor K to send Fai some money before Straw Donor K came over; I believe that the reference to "come over" referred to Straw Donor K's upcoming trip to Pakistan. Ahmad informed Straw Donor K that Straw Donor K could get the money back when he came to Pakistan, adding that since the year was ending, it would be beneficial for him. I believe this conversation represents another instance in which Ahmad informed Straw Donor K to take a tax deduction for monies given to Fai.

119. On December 17, 2010, Ahmad again reminded Straw Donor K about sending money to "the Kashmiris" before Straw Donor K left for Pakistan. I believe that "the Kashmiris" referred to Fai and KAC.

120. In a conversation on December 18, 2010, Straw Donor K asked Ahmad whether if he sent the money [I believe to Fai], it would be possible to get the money returned in U.S. dollars. When Ahmad asked how much he would send, Straw Donor K responded "15," and added that he would be fine if Ahmad gave him back "10" in U.S. dollars and the rest in Pakistani Rupees. Ahmad agreed to do that, and directed Straw Donor K to send "25" as "he" [I believe to be Fai] was in need of money now. Straw Donor K said he would do that but date the check for January. Ahmad replied that would be fine, and told Straw Donor K to bring a copy of the check with him. I believe this conversation is another example of Ahmad reimbursing Straw Donor K for the money he sent to Fai.

121. In a conversation on December 22, 2010, Ahmad asked Fai whether he had received anything from Straw Donor K; Fai replied he had not. Ahmad told Fai that Straw Donor K had

sent it before he left the U.S., and that Ahmad would send Fai "30 plus" from Pakistan. Ahmad also told Fai that Straw Donor H had promised to collect some money and send it to Fai.

122. On January 5, 2011, Fai told Ahmad that he still had not received any donations from Ahmad, Straw Donor H, or Straw Donor K.

123. On January 24, 2011, Fai deposited a \$25,000 check from Straw Donor K into one of the KAC bank accounts.

### H.  Activities and Funding for 2011

#### 1.  Activities

124. On January 6, 2011, Fai received a message from Fozia Bibi, the Third Secretary of the Embassy of Pakistan, attaching a list of 11 media persons and six intellectuals from think tanks that Fai was encouraged to meet and cultivate. On January 10, 2011, Fai responded by noting that he had "requested the DCM" for the list of names, and that he would try to contact the individuals that he did not yet know. I believe that Fai's reference to "DCM" referred to the Deputy Chief of Mission at the Pakistani Embassy. Between January 29, 2011, and March 7, 2011, Fai contacted four of the six individuals named on the "Think Tank" list, as well as the peer of a fifth individual, and asked them whether they would be willing to receive a lecture on the Kashmiri conflict from Fai and the KAC board members.

125. On January 23, 2011, Fai had a conversation with an individual to whom I will refer as "John," who serves as an officer of a Kashmiri organization. My investigation has revealed that John, like Fai, has received numerous emails from Fai's former handler Khan, including the December 18, 2009, email in which Khan advised that he was being replaced by Mahmood.

41

During his conversation with Fai, John complained about Nazir Shawl (Fai's Government of Pakistan-controlled counterpart in the U.K.) and threatened to expose "everything and everybody." He ended by saying that he was prepared to go to the Indian Embassy to beg forgiveness for his previous activities, even if doing so displeased his Pakistani bosses. I believe this call indicates that John knows that Fai, like himself, is acting as an agent of Pakistan.

126. On March 15, 2011, Fai sent an email to Butt advising him that an individual to whom I will refer as "Mary" would be testifying in front of a United Nations working group. Mary is a human rights activist; Major General Mumtaz Ahmad Bajwa had requested that Fai introduce him to Mary in July 2009. The next day, Butt asked Fai to provide Butt with information about the hearing. On March 26, 2011, Fai responded to Butt's request with an email that described Mary's testimony before the U.N. working group. On March 28, 2011, Butt wrote back to Fai with several questions, commenting that he needed additional information to "complete my update for elders." I assess by this phrase that Butt was briefing Fai's information up his chain of command, and that Fai was aware that his information had a greater audience than just Butt.

2. Funding

127. As previously noted, Ahmad told Fai on December 22, 2010, that he would send Fai "30 plus" from Pakistan. I believe "30 plus" is a coded reference to $30,000 of funding for Fai. Between January 10 and March 28, 2011, Fai deposited three checks from Ahmad totaling $23,000 into the KAC bank accounts.

42

128. On March 31, 2011, Fai told Ahmad that he needed checks, and requested that Ahmad call Straw Donor G, Straw Donor H, Straw Donor K, "New York", or "anybody else." I believe Fai used the term "New York" to refer to Straw Donor B.

129. On April 7, 2011, Fai advised Ahmad that he would be traveling to Turkey and requested that Ahmad send $15,000 to Fai via a contact in Istanbul.

130. On April 7, 2011, Butt wrote an email to Fai saying, "Likely to meet with friend Doctor today for need full." Fai responded the next day by writing "Doctor Sahib already informed me that Aspirin was the right medicine which has been delivered." The next day, Butt wrote back, "Go as per the advice of doctor, but keep the dose low." I believe that Fai and Butt were using coded language to discuss Fai's financial transactions with Ahmad, and that Butt was warning Fai not to spend (or request) too much money.

## Conclusion

131. Based on the foregoing, there is probable cause to believe that, from in or about 1995 and continuing until the present date, in the Eastern District of Virginia and elsewhere, Syed Ghulam Nabi Fai and Zaheer Ahmad did unlawfully and knowingly conspire with each other and with others to (1) act as an agent of a foreign principal without registering with the Attorney General, in violation of Title 22, United States Code, Section 612; and (2) falsify, conceal, and cover up material facts they had a duty to disclose by tricks, schemes, and devices, in matters within the jurisdiction of agencies of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001, all in violation of Title 18, United States Code, Section 371.

43

Forfeiture of the proceeds of the conspiracy to act as an unregistered foreign agent is

authorized upon conviction by Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c).

FURTHER THIS AFFIANT SAYETH NOT.

Sarah Webb Linden
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 18, 2011.

/s/Thomas Rawles Jones, Jr.

Thomas Rawles Jones, Jr.
United States Magistrate Judge

44